IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS

TAKAHISA YAMAMOTO,

    Plaintiff,

MICHAEL BROCHON, *et al.*,

    Plaintiffs in Intervention,

LONG CONSULTING, LLC,

    Plaintiff in Intevention,

    and

NORTON LILLY INTERNATIONAL, INC.,

    Plaintiff in Intervention,

    v.

M/V LUTA, O.N. 635750,

    *in rem* Defendant,

    and

LUTA MERMAID, LLC, *et al.*,

    *in personam* Defendants.

Case No. 1:16-CV-00027

***MEMORANDUM DECISION AND ORDER VACATING ARREST
OF THE VESSEL M/V LUTA, O.N. 635750***

### I.    INTRODUCTION

On February 10, 2017, this matter came on for a post-arrest hearing pursuant to Rule E(4)(f) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions to determine whether the arrest of In Rem Defendant M/V LUTA, O.N. 635750 ("Vessel") should not be vacated. After hearing argument from the parties and having considered the briefing papers

and exhibits submitted, the Court found that probable cause for the arrest of the Vessel did not exist and ordered the Vessel released as soon as the fees of Substitute Custodian National Maritime Services, Inc. ("NMS") are paid.[1] This memorandum decision sets forth the reasons for that ruling.

## II.   BACKGROUND

On October 25, 2016, Plaintiff Takahisa Yamamoto filed an *in rem* action against the Vessel to recover funds advanced or loaned to purchase goods and services and asserting a maritime lien against the Vessel under Supplemental Rule C. (Verified Complaint, ECF No. 1.) He moved for a warrant to arrest the Vessel (ECF No. 2) and for an order appointing NMS as substitute custodian for the United States Marshal (ECF No. 5). The Court granted both motions. (Order [for Arrest Warrant], Oct. 25, 2016, ECF No. 4; Order Appointing Substitute Custodian, Oct. 25, 2016, ECF No. 7.) The arrest was made that same day, October 25. (Return, Oct. 27, 2016, ECF No. 8.) Subsequently, three other plaintiffs were permitted to intervene and arrest the Vessel: the crew (Michael Brochon *et al.*), Long Consulting, LLC, and Norton Lilly International, Inc.

On January 9, 2017, on motion of Plaintiff Yamamoto, the Court ordered an interlocutory sale of the Vessel. (Decision and Order, ECF No. 70.) In opposition to the motion, Defendants had asserted that Yamamoto did not have a maritime lien because he was a joint venturer and/or co-owner and not a stranger to the Vessel. Because the intervenors clearly had maritime liens and had joined in seeking an interlocutory sale, the Court granted the motion.

By the end of January, all the intervenors had settled their claims with Defendants, no longer favored an interlocutory sale, and released the Vessel from their warrants. At a hearing on January 31, Defendants requested a post-arrest hearing to put Yamamoto to his burden of showing

---

[1] As ordered from the bench on February 10, payment is to be made no later than 10:00 a.m., February 14, 2017, to the trust account of Marianas Legal Strategy Group, LLC by Plaintiff and Plaintiffs in Intervention, as allocated in the table in NMS's Updated Charge Submission (Feb. 10, 2017, ECF No. 115). A party's failure to pay may result in its being barred from further participation in the proceedings before the Court. *See* Local Admiralty Rule E(10).

probable cause existed to keep the Vessel under arrest. The Court set a briefing schedule and a hearing for February 10. Defendants submitted an Opening Brief (ECF No. 108) on February 3, supported by the same affidavit of Abelina T. Mendiola and twelve exhibits that they had submitted in opposition to the interlocutory sale motion (ECF No. 61-1). Plaintiff Yamamoto filed a Response (ECF No. 111) on February 7, and Defendants filed a Reply Brief (ECF No. 113) on February 9. The morning of the hearing, Yamamoto filed an affidavit supported by four exhibits (ECF No. 117). No party called any witnesses to testify.

### III. DISCUSSION

At a post-arrest hearing in an *in rem* action to enforce a maritime lien, the validity of the arrest of a vessel may be challenged. "To establish a sufficient interest in the vessel to justify its arrest, [plaintiff] must prove prima facie entitlement to a maritime lien." *Amstar Corp. v. S/S Alexandros T.,* 664 F.2d 904, 912 (4th Cir. 1981). The court applies a reasonable grounds/probable cause standard, which "translates roughly to requiring that plaintiff show entitlement to a maritime lien." *Newport News Shipbuilding and Dry Dock Co. v. S.S. Independence,* 872 F. Supp. 262, 265 (E.D. Va. 1994) (cited in *SMS Yacht Maintenance v. One Nautique 210 Pleasure Vessel,* 2012 WL 6737197 (S.D. Cal. Dec. 28, 2012)).

"In the post-seizure hearing, the plaintiff has the burden of showing why the arrest should not be vacated." 4-II Benedict on Admiralty § 2.19. *See Vitol, S.A. v. Primerose Shipping Co. Ltd.,* 708 F.3d 527, 547 (4th Cir. 2013) (noting that Supplemental Rule E(4)(f) places burden on plaintiff). "Plaintiff has the burden under Supplemental Rule E(4)(f) to come forward with sufficient evidence to show there was probable cause for the arrest or attachment of the vessel." *20th Century Fox Film Corp. v. M.V. Ship Agencies, Inc.,* 992 F. Supp. 1423, 1427 (M.D. Fla. 1997).

It is well settled that a joint venturer/co-owner may not assert a valid maritime lien. Because "a joint venturer does not rely on the credit of the vessel(s), but only on the credit of the co-venturer[,]" joint venturers cannot hold a maritime lien. *Fulcher's Point Pride Seafood, Inc. v. M/V Theodora Maria,* 935 F.2d 208 (11th Cir. 1991); *see Security Pacific Nat. Bank v. Ol.s. Pacific Pride, O/N 621200,* 549 F. Supp. 53 (W.D. Wash. 1982) ("the law is clear that owners, part owners, joint venturers and stockholders cannot have a valid maritime lien on any vessel in which they own an interest").

To determine whether a joint venture existed, the court "look[s] to the whole relationship" between the plaintiff and the owner. *Fulcher's Point,* 935 F.2d at 211. Factors include (1) whether the plaintiff exerted significant control over the vessel beyond what a creditor might have had, (2) whether the parties had a joint propriety interest in the vessel, (3) whether they had agreed to share in the profits and losses, and (4) whether they had intended to create a joint venture. *Id.* at 212 (citing *Sasportes v. M/V Sol de Copacabana,* 581 F.2d 1204. 1208 (5th Cir. 1978)). "Perhaps the best example of a joint venture would be a party whose prospective gains resemble the owner's, who has the owner's prerogatives, and who might otherwise appear to investigating creditors to be a part owner. Such a party may, of course have an In personam contract claim against the true owner. But when the seas get rough one who looks, thinks, acts and profits like an owner cannot retreat to the relatively safe harbor of a maritime lienor, who of course has a claim against the ship itself." *Sasportes*, 581 F.2d at 1208–9.

The following evidence reflects that the whole relationship between Yamamoto and the Mendiolas was one of a joint venture in accordance with the *Fulcher's Point* factors. E-mails exchanged between Yamamoto and various Defendants substantiate this relationship. On January 19, 2016, Yamamoto wrote to Defendant Robert Toelkes asking to help "make a good agreement

about our business" with Defendant Fidel Mendiola (ECF No. 61-1, Ex. A). "My basic intention," wrote Yamamoto, "is as follows: Fidel's family and my family are having fifty-fifty relationship about the business when we work together" (*id.*). Yamamoto asked for an accounting from the Vessel's owner, Luta Mermaid, LLC: "I would love to get accounting transaction from last October about Luta mermaid LLC" (*id.*).

On March 27, 2016, Yamamoto wrote to Abelina Mendiola expressly proposing "our agreement about Luta mermaid LLC based on fifty-fifty relationship between your family and my family" (ECF No. 61-1, Ex. B). Yamamoto proposed that the Mendiolas would hold 51 percent of the shares and "Yamamoto family hold 25% stocks (voting stocks) . . . 24% stocks (non voting stocks)" (*id.*). Yamamoto expressly proposed a profit-sharing arrangement ("2. How we share the profit") and "3. Accounting rules" (*id.*). Yamamoto was not loaning Luta Mermaid money; he was investing: "The reason why I try to tell you about this issue [profit sharing] is I don't want to be arrogant investor" (*id.*). Yamamoto was involved in all aspects of Luta Mermaid's purchase and operation of the Vessel: "I would like to study as follows (1) safety rules and regulations for this business[;] . . . (3) Port rules; (4) Labor law; (5) repair and maintain the vessel" (*id.*).

In a local newspaper, the *Marianas Variety* (May 30, 2016), Yamamoto was quoted as saying he "covered the cost to buy the vessel" and gave Luta Mermaid, LLC business advice and financial support (ECF No. 61-1, Ex. C). In an e-mail to Abelina Mendiola on June 4, he apologized for talking to a reporter about the Vessel but reiterated that "Mv Luta is joint venture between your family and my family" (ECF No. 61-1, Ex. D).

Yamamoto does not deny that his intention, starting when he visited the island of Rota in 2013, was to help the Mendiolas and the municipality of Rota to purchase and operate a commercial shipping vessel. (First Amended Complaint, ECF No. 27, ¶¶ 16–18.; Affidavit, ECF

5

1  No. 177, ¶¶ 3, 4.) By January 2015, he had pumped around $2.6 million into the project, either

2  directly himself or through an entity called Kizuna Marine, Inc. (FAC ¶¶ 17, 23, 27.) By February

3  2016, Yamamoto had contributed some $3.414 million "in advances and/or loans," "some portion"

4  of which "had been provided to the Vessel for necessaries." (*Id.* ¶ 44.)

5  In support of probable cause, Yamamoto submitted an e-mail dated April 27, 2014, from

6  Fidel Mendiola, Jr., proposing to abandon the idea of a joint venture, have Yamamoto loan an

7  "additional $300,000 to fully finance ship and bring to homeport of Rota" and pay Yamamoto

8  back "within 2 to 3 months from the date ship arriving to CNMI" (ECF No. 117-1). Even if this is

9  so, a loan to purchase a vessel does not create a maritime lien. To show a valid maritime lien, a

10 plaintiff "must demonstrate that: (1) it provided necessaries; (2) to a vessel; (3) by order of the

11 owner or a person authorized by the owner." *Ventura Packers, Inc. v. F/V Jeanine Kathleen,* 305

12 F.3d 913, 919 (9th Cir. 2002). The term "'necessaries' includes repairs, supplies, towage, and the

13 use of a dry dock or marine railway[.]" 46 U.S.C. § 31301(4). It has been construed to include

14 goods and services useful to keep a vessel safe and capable of performing its particular functions.

15 *In Re Container Applications Int'l, Inc.,* 233 F.3d 1361 n.3 (11th Cir. 2000). Purchase money for

16 the vessel itself does not come under "necessaries."

17 Yamamoto points to a memorandum dated May 21, 2014, in which Fidel Mendiola, Jr.,

18 proposed that "Kizuna Marine can make a loan to Bank of Saipan or CDA where ship can be use

19 [*sic*] as collateral to pay you back." (ECF No. 117-2.) He also puts forward an e-mail from Robert

20 Toelkes on January 22, 2015, in which Toelkes proposes that "Luta Mermaid LLC would have a

21 loan agreement with Takahisa Yamamoto in the amount of whatever the funds are that have been

22 transferred for the benefit of Luta Mermaid LLC," would "have a preferred ship mortgage" in the

23 same amount, and sets forth loan terms (ECF No. 117-4). Again, the purported loans are not for

24

necessaries. Moreover, other parts of these communications indicate that Yamamoto was still more intimately involved with the business than an outside creditor would be. In the memorandum, Mendiola asked Yamamoto to choose which of two vessels to purchase. In Toelkes's e-mail, Toelkes proposed that "Net Profit after all expenses and taxes will be split 50/50. Yamamoto-san $BIG (Bs profit [*sic*] shall be expensed as a salary to Yamamoto-san." (*Id.*) The fact that Toelkes proposed to give Yamamoto a preferred ship mortgage is irrelevant. A shipowner may hold a preferred ship mortgage in the vessel he owns, but that does not give him safe harbor as a maritime lienor. *See L & L Electroncis, Inc. v. M/V Osprey,* 764 F. Supp. 2d 270, 2011 A.M.C. 1651, 1654 (D. Mass. 2011).

### IV. CONCLUSION

From the beginning, Plaintiff Takahisa Yamamoto intended to be involved and was intimately involved in a joint business venture to purchase a commercial shipping vessel to help out the people of Rota, with the prospect of making a respectable profit for himself as a co-owner. He took active part in the structuring of the business and exerted control beyond what a creditor would exert in an arm's length transaction. His whole relationship with Defendants demonstrates he was a joint venturer. Plaintiff has failed to carry his burden to show probable cause that he has a maritime lien on the Vessel.

This is not to say Plaintiff was not harmed by Defendants, that he has no cause to complain about their conduct, or that he cannot prosecute an *in personam* action against them. But his arrest of the Vessel cannot stand. For these reasons, the Court ORDERS as follows:

(1) The arrest of the Vessel is VACATED and all warrants for arrest of the Vessel are QUASHED.

(2) The January 9, 2017 order for the interlocutory sale of the Vessel (ECF No. 70) is

VACATED.

(3) The Vessel will remain in the custody of Substitute Custodian NMS unless and until NMS reports to the Court on February 14, 2017 that all its fees and costs have been paid.

/s/ Frances M. Tydingco-Gatewood
Designated Judge
Dated: Feb 13, 2017